UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------X
YAAKOV PUKHOVICH,

     *Plaintiff*,

                                  **MEMORANDUM & ORDER**

-against-

                               16-CV-1474(KAM)(PK)

CITY OF NEW YORK and TRAFFIC
ENFORCEMENT AGENT CANDICE COURTNEY.

     *Defendants*.
---------------------------------X
**MATSUMOTO, United States District Judge:**

        Plaintiff Yaakov Pukhovich ("plaintiff") commenced

this action against the City of New York (the "City") and

Traffic Enforcement Agent Candice Courtney ("TEA Courtney," and

together with the City, "defendants") on March 25, 2016 pursuant

to 42 U.S.C. § 1983 ("section 1983") and New York law asserting,

in relevant part, false arrest and imprisonment in violation of

his constitutional rights, in connection with his arrest on

March 13, 2015, and subsequent prosecution.

        Presently before the court is defendants' motion for

summary judgment as to all of plaintiff's causes of action.  In

support of their motion, defendants have submitted a memorandum

of law ("Def. Mem.," ECF No. 22), a statement of material facts

pursuant to Local Rule 56.1 ("Def. 56.1," ECF No. 20), and a

declaration by Zachary Bergman, Esq., counsel for defendants

("Bergman Decl.," ECF No. 21), together with accompanying

exhibits.  (ECF Nos. 21-1 through 21-6.)  Defendants have also

submitted a reply memorandum ("Def. Repl.," ECF No. 23), and a reply to plaintiffs' Local Rule 56.1 counter-statement of material facts. (ECF No. 24.)

In addition to his Local Rule 56.1 counter-statement of material facts ("Pl. 56.1," ECF No. 28), plaintiff has submitted a memorandum in opposition to summary judgment. ("Pl. Mem.," ECF No. 27.) Finally, the parties have submitted a Joint Deposition Transcript Annex ("JDTA," ECF No. 25), consisting of excerpts from four transcripts, specifically those of New York Police Department ("NYPD") Officer Patrick Nicolas ("Nicolas Tr.," ECF No. 25 at pp. 3-27),[1] NYPD Officer Elizabeth Judd ("Judd Tr.," ECF No. 25 at pp. 28-52), TEA Courtney ("Courtney Tr.," ECF No. 25 at pp. 53-87), and plaintiff ("Pl. Tr.," ECF No. 25 at pp. 88-129).

For the reasons set forth below, the court denies defendants' motion for summary judgment as to plaintiff's claim for false arrest against TEA Courtney and grants it in all other respects.

---

[1]    Defendants refer to Nicolas as "Sergeant Nicolas" in their papers (*see*, *e.g.*, Def. 56.1 ¶ 1), but he testified that as of March 13, 2015, he held the rank of "Police Officer with the New York City Police Department." (Nicolas Tr. 23:5-10.) This Memorandum and Order refers to him by his rank at the time of the relevant events.

**<u>BACKGROUND</u>**

## I.   Factual Background

The following facts are taken from the parties' Local Rule 56.1 statement, counter-statement, and reply statement, as well as from documents and transcripts cited in the parties' Local Rule 56.1 statements.  Except as otherwise indicated, the facts set forth below from the parties' Local Rule 56.1 statements are undisputed.  The court summarizes only those facts that are relevant and material to the adjudication of the instant motion.

### A.   The March 13, 2015 Incident

#### 1.   *TEA Courtney Issues Parking Ticket*

On March 13, 2015, TEA Courtney was on duty from 8:30 a.m. to 4:30 p.m., and her responsibilities included issuing summonses to vehicles and directing traffic.  (Def. 56.1 ¶ 3; Pl. 56.1 ¶ 3.)  On that date, plaintiff parked his car in a metered parking spot on Avenue P, between East 15th Street and East 16th Street in Brooklyn, New York.  (Def. 56.1 ¶ 4; Pl. 56.1 ¶ 4.)  The nearest meter was not functioning, so plaintiff walked to obtain a parking receipt to display in his car.  (Def. 56.1 ¶ 5, Pl. 56.1 ¶ 5.)

At 11:53 a.m., TEA Courtney issued a parking violation summons and placed it on plaintiff's car.  (Def. 56.1 ¶ 6; Pl. 56.1 ¶ 6; *see also* Notice of Parking Violation, Bergman Decl.

Ex. B, ECF No. 21-2.)  As plaintiff turned from East 16th street

onto Avenue P and saw TEA Courtney and called out to her.  (Def.

56.1 ¶ 7-8, Pl. 56.1 ¶ 7-8.)  More specifically, plaintiff

testified at his deposition that he "raised [his] voice" and

"start[ed] screaming to [TEA Courtney]" that he had "a ticket,"

by which he appears to have meant that he had a meter receipt.[2]

(Pl. Tr. 50:18-51:6; *see also* Def. 56.1 ¶ 8 ("Plaintiff screamed

to [TEA] Courtney" (citing Pl. Tr. 50:18-51:6)); Pl. 56.1 ¶ 8

(objecting to defendants' characterization but admitting

plaintiff "started shouting and screaming, and waving his arms

to notify [TEA Courtney] that he had a ticket (muni-meter

receipt)".)

### *2. Plaintiff's Arrest*

Plaintiff continued towards his car and, upon

arriving, observed that TEA Courtney had issued a parking ticket[3]

and placed it on his car.  (Def. 56.1 ¶ 9; Pl. 56.1 ¶ 9.)

Plaintiff attempted to show TEA Courtney his meter receipt in

the hopes that she would reconsider her issuance of the parking

---

[2]    Plaintiff testified in Russian at his deposition, and an interpreter
translated questions and answers between English and Russian.  (Pl. Tr. at
4:1-4, *see also* Pl. Tr. at 8:17-9:11 (discussing plaintiff's language
abilities and reasons for testifying in Russian).)  In context, construing
the facts in a manner favorable to the non-moving plaintiff, and based on
plaintiff's Local Rule 56.1 Counter-statement, it appears that by "a ticket,"
plaintiff meant a meter receipt.  (*See* Pl. 56.1 ¶ 8.)
[3]    The parties use the terms "ticket" and "summons" interchangeably in
referring to the document TEA Courtney issued plaintiff at 11:53 a.m.  (*See*
Def. 56.1 ¶¶ 6, 9; Pl. 56.1 ¶¶ 6, 9.)  The document itself is styled as a
"Notice of Parking Violation."  (Bergman Decl. Ex. B, ECF No. 21-2.)

ticket (Def. 56.1 ¶ 10; Pl. 56.1 ¶ 10), but TEA Courtney did not accept plaintiff's proof of payment. (Def. 56.1 ¶ 11; Pl. 56.1 ¶ 11.) At this point, the parties' contentions diverge sharply.

### i. *Plaintiff's Contentions*

According to plaintiff, TEA Courtney responded to plaintiff's protestations by telling him to "[g]o to the court and sue," and plaintiff then "asked her to call the police" because he believed TEA Courtney's actions to be "illegal." (Pl. Tr. 55:22-56:8.) At his deposition, plaintiff testified that TEA Courtney refused to call the police, then began "screaming . . . stop hitting me, stop, stop, don't push me" into her work-issued radio. (*Id.* at 57:14-21; *see also id.* at 59:5-10 (asserting that TEA Courtney "was screaming don't push me don't hit me" into her radio).) Plaintiff also testified that TEA Courtney "turned on [her] radio and shoved it into [plaintiff's] face (*id.* at 59:1-4), such that a "little piece of the antenna . . . touched the piece of [his] nose," but "not hard." (*Id.* at 60:3-10.)

According to plaintiff, "after a minute or so," a man and woman arrived on the scene, both in uniform. (*Id.* at 59:5-10.) Plaintiff characterized their uniforms as "traffic agent" uniforms, rather than police uniforms. (*Id.* at 64:1-6.) According to plaintiff, he did not speak to the uniformed man and woman, and after their arrival, he "just turned around and

5

left" to go to his office, which was located at most one to two minutes away from the spot where he parked his car. (*Id.* at 64:9-65:24.) Plaintiff further testified that approximately two to three minutes elapsed between the time that he reached his car and the arrival of uniformed personnel, and that he never cursed at TEA Courtney, followed her up the street, or pushed her. (*Id.* at 59:11-60:6.) He also denied that he screamed at TEA Courtney after he reached his car, but admitted that he "raise[d] [his] voice because[] [he] was nervous." (*Id.* at 58:8-19.) After plaintiff left the scene and just before plaintiff arrived at his office, two civilians on the street "screamed to [plaintiff] saying that somebody [was] calling [him]." (*Id.* at 64:23-65:14.)

Plaintiff testified that at this point, he returned to the area where his car was parked (*id.* at 65:15-18), where there were now two police cars and four or five police officers, in addition to TEA Courtney and the uniformed man and woman. (*Id.* at 65:25-66:22.) According to plaintiff, a tall white male police officer then approached plaintiff, informed plaintiff that the police had received a complaint that plaintiff had "hit[] someone, and that [he] pushed [TEA Courtney]." (*Id.* at 67:4-18.) Plaintiff protested that TEA Courtney had done a "wrong thing" by ticketing his car and showed his meter receipt

to the police officer, and plaintiff was placed under arrest.
(*Id.* at 67:19-68:9.)

### ii.  Defendants' Contentions

Defendants agree that after TEA Courtney refused to
accept plaintiff's proof of payment, plaintiff protested and
raised his voice at TEA Courtney.  (Def. 56.1 ¶¶ 10-11; Courtney
Tr. 44:8-22.)  Defendants' contentions of fact then diverge from
plaintiff's: at her deposition, TEA Courtney testified that at
some point, she began to walk away from plaintiff, who then
pushed TEA Courtney from behind.  (Courtney Tr. at 46:1-7.)[4]
Based solely on deposition testimony from TEA Courtney,
defendants assert that a black male construction worker who had
been standing at the corner of 16th Street and Avenue P saw
plaintiff push TEA Courtney, "ran over . . . and told
[plaintiff] not to put his hands on [TEA Courtney] again."  (*Id.*
at 46:8-25.)

Although the parties sharply dispute the substance of
plaintiff's initial interaction with TEA Courtney, defendants
agree with plaintiff's deposition testimony that after the
initial interaction, plaintiff "turned around," left the scene,
and walked towards his office, but stopped and returned to the
place where the initial interaction occurred because civilians

---

[4]     The relevant exchange actually begins on page 45 of the transcript of
TEA Courtney's deposition, but that page is not included in the Joint
Deposition Transcript Appendix.

on the street "started screaming" to plaintiff and informed him
that others were calling for him.  (Def. 56.1 ¶ 13; Pl. 56.1 ¶
13.)

        Defendants further assert  that at approximately 12:00
p.m. on March 13, 2015, Police Officer Patrick Nicolas ("Officer
Nicolas"), who was at the time on "regular patrol" and assigned
to the NYPD's 63rd Precinct, was inside a Turkish restaurant on
East 16th Street about 300 feet south of Avenue P, when a black
male construction worker "flagged [him] down."  (Def. 56.1 ¶¶ 1,
15; Pl. 56.1 ¶ 1; Nicolas Tr. 23:5-13, 30:3-32:17.)  According
to Officer Nicolas's deposition testimony, the construction
worker stated to Officer Nicolas that an "[o]fficer was getting
assaulted . . . at the corner," (Nicolas Tr. 58:19-25),[5] and
Officer Nicolas then proceeded to Avenue P.  (*Id.* at 59:1-3; *see
also id.* at 45:4-18.)

        Officer Nicolas testified that, after leaving the
Turkish restaurant and going to Avenue P, he spoke with TEA
Courtney, who was "upset" and "crying" (Nicolas Tr. at 59:11-
19), and told him that

        she was giving somebody a ticket, the individual
        came out, was upset about the ticket[,] . . .

---

[5]    Plaintiff's counsel objected to this portion of Officer Nicolas's
testimony, and plaintiff's Local Rule 56.1 counter-statement asserts that
this portion of the testimony is inadmissible hearsay.  (Def. 56.1 ¶ 16; Pl.
56.1 ¶ 16.)  For purposes of this Memorandum and Order, the court considers
Officer Nicolas's testimony regarding what the construction worker told him
for its effect on Officer Nicolas, rather than as evidence of the truth of
the matter asserted (*i.e.*, that an "[o]fficer was actually assaulted).  *See*
Fed. R. Evid. 801(c)(2).

> [TEA Courtney] tried to walk away from the
> individual, . . . the individual then got in
> front of [TEA Courtney's] face and started
> yelling and screaming.  Once she tried to pass
> the . . . individual, the individual pushed her
> preventing her to pass and once again stated he
> had a problem with the ticket.

(*Id.* at 45:15-46:13.)

At her deposition TEA Courtney testified that she spoke with Officer Nicolas (Courtney Tr. at 50:17-51:9), and stated in general terms that she "explained to [Officer Nicolas] briefly what happened" (*id.* at 49:21-50:5), but did not testify as to what she specifically told Officer Nicolas regarding the substance of her initial interaction with plaintiff.  The parties agree that after arriving at Avenue P, Officer Nicolas asked TEA Courtney to identify the individual with whom she had interacted, and who defendants contend pushed TEA Courtney. (Def. 56.1 ¶ 19; Pl. 56.1 ¶ 19.)  The parties also agree that TEA Courtney identified plaintiff by pointing at him (*id.*), indicating that at the time of this identification, plaintiff was present at the scene.

According to defendants' Local Rule 56.1 statement, Officer Nicolas testified at his deposition that after TEA Courtney identified plaintiff, Officer Nicolas spoke to plaintiff, who stated that he "had an altercation with a traffic agent."  (Def. 56.1 ¶ 20.)  Defendants, however, support this contention of fact with a citation to pages 62 and 67-68 of the

transcript of Officer Nicolas's deposition, which are not in the record. (*See* JDTA, ECF No. 25, at pp. 25-27 (containing pages 59, 63, and 71 of Officer Nicolas's deposition transcript but not pages 62 or 67-68).) Further, plaintiff "denies that this conversation was with [Officer] Nicolas." (Pl. 56.1 ¶ 20.) Nevertheless, the parties agree that at some point after TEA Courtney identified plaintiff, plaintiff had a conversation with a police officer during which he was not free to leave. (Def. 56.1 ¶ 20; Pl. 56.1 ¶ 20.)

Officer Nicolas testified at his deposition that, after he spoke with plaintiff, he put out a radio transmission and a police officer and sergeant from the 61st Precinct, both male, arrived within approximately five minutes. (Nicolas Tr. at 39:19-40:13, 48:19-50:12.) Officer Nicolas testified that he "gave the responding officers from the 61st Precinct the information given to [him] by the construction worker," who was "still on Avenue P and East 16th Street" as Officer Nicolas "was walking back to the Turkish restaurant" after the officers from the 61st Precinct responded. (*Id.* at 39:5-14.) Plaintiff was ultimately placed under arrest by a uniformed male police officer. (Def. 56.1 ¶ 23; Pl. 56.1 ¶ 23.)

B.   **Subsequent Events**

Following plaintiff's arrest, he was transported to the New York Police Department's 61st Precinct (*id.*), where an

unidentified police officer questioned him.  (Def. 56.1 ¶ 26;
Pl. 56.1 ¶ 26.)  After plaintiff's arrival at the 61st Precinct,
NYPD Officer Elizabeth Judd ("Officer Judd"), who was assigned
to the 61st Precinct on March 13, 2015, also arrived.  (Def.
56.1 ¶¶ 2, 24-25; Pl. 56.1 ¶¶ 2, 24-25.)  Although Officer Judd
had never reported to the incident location (*i.e.*, Avenue P
between 15th and 16th Streets), she "was the assigned arresting
officer."  (Def. 56.1 ¶ 24; Pl. 56.1 ¶ 24.)

At her deposition, Officer Judd testified that, once
at the 61st Precinct, she received information regarding the
incident from TEA Courtney, a Sergeant Potoma, and/or an Officer
Farah,[6] then consulted with the New York Police Department Legal
Bureau.  (Judd Tr. 37:17-38:4, 39:21-40:25; *see also* Def. 56.1
¶¶ 28-29, Pl. 56.1 ¶¶ 28-29.)  The criminal complaint against
plaintiff, which Officer Judd signed, however, makes no mention
of any source of information other than TEA Courtney.
Specifically, the criminal complaint states that

> The source of deponent's information and the
> grounds for deponent's belief are as follows:
>
> Deponent is informed by [TEA Courtney (the
> "informant")] . . . that, at the above time and
> place, the informant did issue the defendant a
> summons . . . after which, defendant approached
> informant, repeatedly shouted at informant at

---

[6]    The parties do not mention Sergeant Potoma or Officer Farah in their
Local Rule 56.1 statements or briefing papers, and the nature of their
involvement in the alleged events underlying the instant action is therefore
unclear.  In any event, the nature of their involvement is not material to
the adjudication of the instant motion.

which point, informant attempted to walk away
from defendant and defendant placed defendant's
person in front of the informant and pushed
informant about informant's person, all of which,
prevented informant from traffic enforcement,
specifically inspecting parked vehicles at the
above mentioned location.

(Criminal Complaint, ECF No. 30-1.)[7]

In any event, the parties agree that based on the

information imparted to her, Officer Judd made the decision as

to plaintiff's arrest charge and, after drafting related

paperwork, spoke with a Kings County Assistant District

Attorney. (Def. 56.1 ¶ 29; Pl. 56.1 ¶ 29.) The Kings County

District Attorney's office then made its own charging decisions,

(*id.*), and plaintiff was ultimately charged with Obstructing

Governmental Administration in the Second Degree, Menacing in

the Third Degree, and Harassment in the Second Degree. (Def.

56.1 ¶ 30; Pl. 56.1 ¶ 30.)

Plaintiff was released from custody at approximately

11:00 a.m. on March 14, 2015, the day after his arrest, "after

speaking with a judge."[8] (Def. 56.1 ¶ 34; Pl. 56.1 ¶ 34; *see*

---

[7]     The Bergman Declaration annexed a copy of the criminal complaint as
Exhibit C, but that copy is almost entirely illegible. (*See* Bergman Decl.
Ex. C, ECF No. 21-3.) Consequently, the court ordered defendants to file a
legible copy of the exhibit on the docket, and defendants complied. Because
it is more legible, citations to the criminal complaint are to the second
copy, filed at ECF No. 30-1.
[8]     Although the parties do not expressly say so in their papers, based on
plaintiff's testimony contained on the cited deposition transcript page, it
appears that plaintiff appeared before a judge to be arraigned. (*See* Pl. Tr.
at 84:5-12 (indicating that plaintiff understood the charges against him when
plaintiff went before the judge, his attorney spoke to the judge, and
plaintiff was subsequently released).)

*also* Pl. Tr. at 84:10-14.) Following his release, plaintiff returned to court two more times, and the charges against plaintiff were ultimately dismissed on June 24, 2015. (Def. 56.1 ¶ 35; Pl. 56.1 ¶ 35; Certificate of Disposition, Bergman Decl. Ex. D, ECF No. 21-4.)

## II.  Procedural History

Plaintiff commenced the instant action by filing a complaint ("Compl." or the "complaint," ECF No. 1) against defendants on March 25, 2016. The parties proceeded to discovery under the supervision of the Honorable Peggy Kuo, United States Magistrate Judge. (*See*, *e.g.*, August 12, 2016 Minute Entry, ECF No. 8; November 15, 2016 Docket Minute Entry; March 9, April 3, and April 25, 2017 Docket Orders Regarding Discovery Extensions.) On June 23, 2017, the court granted defendants leave to file the instant motion and set a briefing schedule (*see* June 23, 2017 Minute Entry), and as contemplated in that briefing schedule, the motion was fully briefed and submitted on September 25, 2017.

**LEGAL STANDARD**

Through the instant motion, defendants seek summary judgment pursuant to Federal Rule of Civil Procedure ("Rule") 56, which provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as

13

to any material fact and the movant is entitled to judgment as a matter of law."  Fed R. Civ. P. 56(a).

## I.  Rule 56 Generally

"[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original).  A fact is material if it "might affect the outcome of the suit under the governing law," and a dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.* at 248.  For a genuine issue of material fact to exist, there must be "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  *Id.* at 249-50 (citations omitted).

In reviewing a motion for summary judgment, the court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments."  *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 122 (2d Cir. 2004) (quoting *Weyant v. Okst*, 101 F.3d 845, 854 (2d Cir. 1996));

*accord Tolan v. Cotton*, 134 S. Ct. 1861, 1863 (2014) ("[I]n ruling on a motion for summary judgment, 'the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.'" (quoting *Anderson*, 477 U.S. at 255)); *Simon v. City of New York*, 893 F.3d 83, 91 (2d Cir. 2018) ("We review a district court's grant of summary judgment *de novo*, resolving all ambiguities and drawing all reasonable factual inferences in favor of the party against whom summary judgment is sought." (internal quotation marks and citation omitted)).

The moving party has the burden of establishing the absence of a genuine dispute as to any material fact, and in opposing summary judgment, the nonmoving party "need only present evidence from which a jury might return a verdict in his favor" to defeat a motion for summary judgment. *Anderson*, 477 U.S. at 256-57. To meet this burden, however, a party opposing summary judgment must "come forward with specific facts showing that there is a *genuine issue for trial*," not merely "show that there is some metaphysical doubt as to the material facts." *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) (emphasis in original) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)).

In opposing summary judgment, it is "not sufficient merely to assert a conclusion without supplying supporting

arguments or facts," and a party must instead set forth

"concrete particulars." *BellSouth Telecommunications, Inc. v.*

*W.R. Grace & Co.-Conn.*, 77 F.3d 603, 615 (2d Cir. 1996)

(internal quotation marks and citations omitted).  Accordingly,

"[t]he nonmoving party must go beyond the pleadings, and by his

or her own affidavits, or by the depositions, answers to

interrogatories, and admissions on file, designate specific

facts showing that there is a genuine issue for trial." *Davis*

*v. New York*, 316 F.3d 93, 100 (2d Cir. 2002) (citations

omitted); *accord Celotex Corp. v. Catrett*, 477 U.S. 317, 324

(1986).

Finally, when a defendant "moves for summary judgment

on an issue that the plaintiff must prove at trial[,] [the

defendant] need only point to an absence of proof on plaintiff's

part" and "need not prove a negative." *Parker v. Sony Pictures*

*Entm't, Inc.*, 260 F.3d 100, 111 (2d Cir. 2001).  In such a

situation, a plaintiff must "designate specific facts showing

that there is a genuine issue for trial" to defeat summary

judgment.  *Id.* (quoting *Celotex*, 477 U.S. at 324).

## II.  Conflicting Testimony

Consistent with the principle that the court may not

weigh evidence or assess credibility at the summary judgment

stage, "as a general rule, a district court may not discredit a

witness's deposition testimony on a motion for summary judgment,

because the assessment of a witness's credibility is a function reserved for the jury." *Fincher v. Depository Tr. & Clearing Corp.,* 604 F.3d 712, 725 (2d Cir. 2010) (citing *Scholastic, Inc. v. Harris,* 259 F.3d 73, 87 (2d Cir. 2001)). Therefore, so long as each side "tells a story that is at least plausible and would allow a jury to find in its favor, it is for the jury to make credibility determinations and apportion liability." *Bale v. Nastasi*, 982 F. Supp. 2d 250, 258-59 (S.D.N.Y. 2013) (citing *Fincher*, 604 F.3d at 726, and *Wentworth v. Hedson*, 493 F.Supp.2d 559, 568-69 (E.D.N.Y. 2007)). If, however, a party "relies almost exclusively on his own testimony, much of which is contradictory and incomplete," *Fincher*, 604 F.3d at 725 (quoting *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005)), or is "rife with inconsistencies such that it [is] facially implausible," *id.* at 726, summary judgment may be appropriate.

## DISCUSSION

Plaintiff's complaint asserts five causes of action, (*see* Compl. ¶¶ 26-63), and defendants seek summary judgment as to all five. (*See* Def. Mem. at 1.) As an initial matter, in his opposition to defendants' summary judgment motion, plaintiff concedes that the fourth and fifth causes of action set forth in his complaint, which assert a state law malicious prosecution against TEA Courtney and a state law negligence claim against the City "must be dismissed." (Pl. Mem. at 1 n.1.)

Accordingly, defendants are entitled to summary judgment dismissing the claims in the fourth and fifth causes of action.

With respect to plaintiff's remaining causes of action, as set forth below, the court concludes that defendants are entitled to summary judgment dismissing plaintiff's first cause of action for "Deprivation of Federal Civil Rights Under 42 U.S.C. § 1983." The court further concludes that plaintiff's second and third causes of action are properly construed as a single cause of action against TEA Courtney for false arrest under section 1983, and that TEA Courtney is not entitled to summary judgment as to this cause of action.

## I. Deprivation of Federal Civil Rights

Plaintiff's first cause of action asserts a claim for "Deprivation of Federal Civil Rights Under 42 U.S.C. § 1983" against both TEA Courtney and the City. (Compl. at 3.) The complaint, in conclusory fashion, generally asserts, *inter alia*, that defendants' "acts deprived plaintiff of the rights, privileges and immunities guaranteed to citizens of the United States by the First, Fourth, and Fourteenth Amendments" to the United States Constitution "based on plaintiff's national origin and ethnic background and physical appearance." (*Id.* ¶ 27-34.) Neither party, however, specifically mentions this cause of action in its briefing. Nevertheless, defendants' moving papers clearly indicate that they seek summary judgment as to "all of

[p]laintiff's claims" (Def. Mem. at 1), and plaintiff's
responsive papers fail to mention his first claim for relief, or
oppose summary judgment against plaintiff on this claim.

Accordingly, the court deems plaintiff's first cause
of action abandoned, and grants summary judgment dismissing his
claim for deprivation of federal civil rights. *See Santiago v.
City of New York*, No. 05-CV-3668(RRM)(VVP), 2009 WL 935720, at
*11 n.19 (E.D.N.Y. Mar. 31, 2009) (citing *Taylor v. City of New
York*, 269 F. Supp. 2d 68, 75 (E.D.N.Y. 2003) (deeming abandoned
and dismissing a section 1983 First Amendment retaliation claim
where defendants' summary judgment brief asserted that the claim
was a "typographical error" and plaintiff "d[id] not argue any
claim under the First Amendment in her opposition"); *see also
Singleton v. City of Newburgh*, 1 F. Supp. 2d 306, 312 (S.D.N.Y.
1998) ("The Complaint also alleges that the City and Department
failed to train police officers in the proper use of force.
However, it appears that plaintiff has abandoned this claim,
because it is not raised elsewhere in the record." (citing
*Carnegie v. Miller*, 811 F. Supp. 907, 913 (S.D.N.Y. 1993)))).

Further, even if plaintiff had not abandoned his first
cause of action, the court would deem it duplicative of his
section 1983 false arrest claim.  Plaintiff has not presented
any evidence or argument regarding any purported violation of
his first amendment rights.  Instead, plaintiff's evidence and

arguments address only the purported impropriety of his March 13, 2015 arrest. (*See generally* Pl. Opp.; Pl. 56.1.)[9] Consequently, plaintiff's claims are properly analyzed as false arrest claims implicating his fourth amendment right to be free from unreasonable seizures, and not under the due process clause of the fourteenth amendment. *See Russo v. City of Bridgeport*, 479 F.3d 196, 208 (2d Cir. 2007) ("[W]here a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment . . . must be the guide for analyzing these claims." (internal quotation marks and citation omitted)); *Lozada v. Weilminster*, 92 F. Supp. 3d 76, 102 (E.D.N.Y. 2015) ("Plaintiff's Fourteenth Amendment due process claims sound in false arrest, malicious prosecution, and excessive force, and are properly analyzed under the Fourth Amendment."). Thus, the first cause of action for "Deprivation of Federal Civil Rights Under 42 U.S.C. § 1983" is dismissed.

## II.  False Arrest

Plaintiff's remaining causes of action are against TEA Courtney for false arrest (Second Cause of Action) and false

---

[9]    Plaintiff's opposition memorandum asserts that where a government agent "creates false information [and] forwards that information to prosecutors, she violates the plaintiff's 'constitutional right to a fair trial'" (Pl. Opp. at 3 (quoting *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 130 (2d Cir. 1997))), but plaintiff here was never tried.  Plaintiff's assertion and citation to *Ricciuti* are therefore, respectively, irrelevant and inapposite.

imprisonment (Third Cause of Action) under Section 1983.

(Compl. ¶¶ 35-46.)[10]  Courts analyzing section 1983 false arrest

claims "generally look[] to the law of the state in which the

arrest occurred." *Dancy v. McGinley*, 843 F.3d 93, 107 (2d Cir.

2016) (citation omitted).  Thus, when based on an arrest that

occurred in New York, "[a] claim for false arrest under

[s]ection 1983, resting on the Fourth Amendment right to be free

from unreasonable seizures, including arrest without probable

cause, is substantially the same as that under New York law."

*Li v. City of New York*, 246 F. Supp. 3d 578, 600 (E.D.N.Y. 2017)

(citing *Jenkins v. City of New York*, 478 F.3d 76, 84 (2d Cir.

2007)).

Further, as the Second Circuit and district courts

within it have made clear, "[i]n New York, the tort of false

arrest is synonymous with that of false imprisonment." *Posr v.

Doherty*, 944 F.2d 91, 96 (2d Cir. 1991) (citing *Jacques v.

Sears, Roebuck & Co.*, 285 N.E.2d 871, 877 (N.Y. 1972)); *accord

Li*, 246 F. Supp. 3d at 600 n.13 (declining to address

plaintiff's section 1983 false imprisonment claim separately

from plaintiff's section 1983 false arrest claim because the

---

[10]    Plaintiff's complaint asserts a Second Cause of Action for "False
Arrest Under 42 U.S.C. § 1983" at paragraphs 35 through 40, which could be
read as attempting to assert a false arrest claim against the City.  However,
plaintiff's memorandum of law in opposition to the instant motion only
addresses this claim as it relates to TEA Courtney, and gives no indication
that plaintiff intends to assert it against the City.  Accordingly, to the
extent plaintiff's false arrest cause of action was initially intended to be
asserted against the City, the court deems it abandoned.

21

causes of action are "synonymous").  Accordingly, the court

finds that the Second and Third Causes of Action are duplicative

and "construes them to set forth one claim for false arrest."

*Jackson v. City of New York*, 29 F. Supp. 3d 161, 169 n.8

(E.D.N.Y. 2014).

### A.   Elements of the Section 1983 False Arrest Cause of Action

Section 1983 imposes liability on any person who

deprives another of the "rights, privileges, or immunities

secured by the Constitution and laws" of the United States under

color of law, 42 U.S.C. § 1983, but does not itself create any

substantive rights.  *Albright v. Oliver*, 510 U.S. 266, 271

(1994).  "In order to maintain a section 1983 action, two

essential elements must be present: (1) the conduct complained

of must have been committed by a person acting under color of

state law; and (2) the conduct complained of must have deprived

a person of rights, privileges, or immunities secured by the

Constitution or laws of the United States."  *Pitchell v. Callan*,

13 F.3d 545, 547 (2d Cir. 1994) (citations omitted).

Additionally, a plaintiff must establish a defendant's "personal

involvement . . . in alleged constitutional deprivations [a]s a

prerequisite to an award of damages under [section] 1983."

*Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (quoting

*Moffitt v. Town of Brookfield*, 950 F.2d 880, 885 (2d Cir.
1991)).

In addition to the foregoing elements applicable to
all section 1983 actions, to establish a section 1983 false
arrest claim arising from a New York arrest, a plaintiff must
establish that "(1) the defendant intended to confine the
plaintiff, (2) the plaintiff was conscious of the confinement,
(3) the plaintiff did not consent to the confinement and (4) the
confinement was not otherwise privileged."  *Weyant*, 101 F.3d at
853 (quoting *Singer v. Fulton Cty. Sheriff*, 63 F.3d 110, 118 (2d
Cir. 1995)).  "The existence of probable cause to arrest
constitutes justification and 'is a complete defense to an
action for false arrest.'"  *Id.* at 852 (quoting *Bernard v.
United States*, 25 F.3d 98, 102 (2d Cir. 1994)).

**B.  Application**

Here, it is abundantly clear from the undisputed facts
that plaintiff was confined, was conscious of his confinement,
and did not consent to it.  Further, viewing the evidence in the
light most favorable to plaintiff and drawing all inferences in
his favor, genuine disputes of material fact remain for trial
regarding whether TEA Courtney intended to confine plaintiff,
was personally involved in his arrest, and acted without
privilege to confine plaintiff.  Moreover, based on plaintiff's
evidence, a reasonable jury could find that TEA Courtney acted

under state law to at the time of the events giving rise to this action.

### 1. Intent to Confine and Personal Involvement

TEA Courtney's role in plaintiff's arrest was that of a complainant, not that of an arresting officer, although she was performing her duties as a traffic enforcement agent, which performance resulted in the events giving rise to this action. "[A] complainant can be held liable for false arrest if the complainant 'intentionally provided false information' to instigate an arrest by law-enforcement officials, or had no reasonable basis for the report." *Biswas v. City of New York*, 973 F. Supp. 2d 504, 519 (S.D.N.Y. 2013) (quoting *Brown v. Nassau Cnty.*, 760 N.Y.S.2d 655, 655-56 (N.Y. App. Div. 2003) and citing *Weintraub v. Bd. of Educ. of City of New York*, 423 F. Supp. 2d 38, 56 (E.D.N.Y. 2006), *reconsidered on other grounds*, 489 F. Supp. 2d 209 (E.D.N.Y. 2007), *aff'd on other grounds*, 593 F.3d 196 (2d Cir. 2010)); *see also Curley v. AMR Corp.*, 153 F.3d 5, 13-14 (2d Cir. 1998) ("For false imprisonment liability to attach to one who causes or directs an arrest or imprisonment in New York, 'the defendant must have affirmatively induced the officer to act, such as taking an active part in the arrest and procuring it to be made or showing active, officious and undue zeal to the point where the officer is not acting of his own

volition.'" (quoting 59 N.Y. Jur. 2d False Imprisonment § 37 (1987))).

Here, plaintiff testified under oath at his deposition that when he verbally protested the parking ticket issued by TEA Courtney, she responded by "screaming . . . stop hitting me, stop, stop, don't push me" into her city-issued radio.  (Pl. Tr. at 57:14-21; *see also* Pl. Tr. at 59:5-10 (asserting that TEA Courtney "was screaming don't push me don't hit me" into her radio).)  Plaintiff also denied that he ever swore at TEA Courtney, "follow[ed] her up the street," or "push[ed] her." (*Id.* at 59:16-60:6.)  Additionally, it is undisputed that TEA Courtney identified plaintiff as her alleged assailant to the police.  (Def. 56.1 ¶ 19; Pl. 56.1 ¶ 19.)

Plaintiff's testimony raises an issue of material fact for trial because it is not "contradictory and incomplete," nor is it "rife with inconsistencies such that it [i]s facially implausible."  *Fincher*, 604 F.3d at 725-26 (citations omitted). Consequently, for purposes of this motion, the court must view the record in the light most favorable to plaintiff and draw all reasonable inferences in his favor.  Evaluating plaintiff's testimony in this manner, the court concludes that a reasonable jury could find that TEA Courtney was not pushed or hit by plaintiff, but instead, in the course of performing her official duties, that she intentionally conveyed a false account of an

ongoing assault against her over her city-issued radio, and that
upon the NYPD's arrival on the scene, she falsely identified
plaintiff as the perpetrator of the purportedly fabricated
assault.  From this, a reasonable jury could conclude that TEA
Courtney had the requisite intent for plaintiff to be arrested,
and that she instigated and was "personally involved" in
plaintiff's arrest.

Further, the authority to which defendants cite is
readily distinguishable and, therefore, unpersuasive.  In
*Williams v. Young*, the United States District Court for the
Southern District of New York granted summary judgment on a
false arrest claim to a Veterans Affairs ("VA") police officer
who issued a VA driver summonses that carried only monetary
penalties and prepared a related Uniform Offense Report (the
"Report") where, unbeknownst to the VA officer, the driver was
on parole and the summonses and Report resulted in the driver's
arrest for violating his parole conditions.  769 F. Supp. 2d
594, 597-98, 602-03 (S.D.N.Y. 2011).  The court reasoned, in
relevant part, that in light of the VA officer's lack of
awareness of the driver's status as a parolee, and the officer's
decision to issue summonses that "carried only monetary fines,"
rather than charge offenses carrying jail time, the plaintiff
had not come forward with sufficient evidence of intent to
confine.  *Id.* at 602.

Similarly, in *Pettus v. City of New York*, a United States Magistrate Judge recommended, in a detailed Report and Recommendation, that the district court dismiss a plaintiff's false arrest claim against a federal probation officer who allegedly reported the plaintiff's whereabouts to NYPD officers because the complaint "c[ould not] reasonably be construed to allege that [the probation officer] intended to confine [the plaintiff]." No. 10-CV-1442(CBA)(JO), 2011 WL 4458963, at *6 (E.D.N.Y. Aug. 26, 2011), *report and recommendation adopted*, 2011 WL 4439671 (E.D.N.Y. Sept. 23, 2011).

Here, as discussed above, a jury could credit plaintiff's testimony that he did not push TEA Courtney and also credit plaintiff's testimony that TEA Courtney transmitted a wholly fabricated account of an ongoing assault by plaintiff over her city-issued radio. Additionally, there is no dispute that TEA Courtney identified plaintiff as her assailant to responding police officers. From this information, a jury could readily infer that TEA Courtney intended to effect plaintiff's arrest, and therefore to confine him. Although *Williams v. Young* and *Pettus* correctly articulate applicable law, the plaintiffs in those actions presented readily distinguishable facts.

Further, in *Williams v. Smith*, the Second Circuit concluded that the district court had properly granted summary

judgment in favor of a corrections officer who "filed an Inmate Misbehavior Report accusing plaintiff . . . of failing to stand during [a prisoner] count" on the grounds that the plaintiff "had failed to raise an issue of material fact regarding the personal involvement of [the corrections officer] in the alleged violation of plaintiff's rights." 781 F.2d 319, 320 (2d Cir. 1986). The constitutional violation in question, however, was a denial of plaintiff's due process rights to call witnesses and present evidence at a disciplinary hearing, *id.* at 322 (citations omitted), and although the hearing was convened because of the report, the plaintiff had not come forward with any evidence, or even alleged, that the corrections officer had actually been involved in conducting the hearing. *Id.* at 324.

*Williams v. Smith* is therefore inapposite, as it stands merely for the proposition that "[t]he filing of a false report does not, of itself, implicate the guard who filed it in constitutional violations which occur at a subsequent disciplinary hearing." *Id.* (citation omitted). This proposition is wholly irrelevant to the question here, which is whether TEA Courtney's alleged fabrication of a report of an assault and identification of plaintiff as her alleged assailant render her "personally involved" in plaintiff's arrest.

Defendants correctly note that in *Collins v. Brown*, the New York Supreme Court, Appellate Division, affirmed a trial

court's dismissal of, in relevant part, malicious prosecution and false arrest claims against a robbery victim who "played no part in plaintiff's arrest or imprisonment other than to provide information to the legal authorities identifying plaintiff as the perpetrator of the crime."  514 N.Y.S.2d 538, 540 (N.Y. App. Div. 1987).  *Collins*, however, involved a plaintiff who had been arrested and indicted on charges arising from two separate robberies, and the relevant victim had identified him as the perpetrator only with respect to one.  *Id.* at 539-40.  Further, when the victim identified the plaintiff, she was not aware that he was a suspect in the other robbery.  *Id.* at 540.

Based on the victim's lack of awareness regarding the other robbery, the Appellate Division concluded that the plaintiff could not establish that the identification was malicious, and therefore that plaintiff could not rebut the presumption of probable cause for his prosecution that his indictment created.  *Id.*  It was in this context that the Appellate Division made the observation regarding the victim's liability to which defendants here cite.  *Id.*  Further, unlike the instant action, the *Collins* plaintiff had been arrested pursuant to a valid warrant, which in turn made the arrest privileged absent a "showing of malice," which the *Collins* plaintiff had not made.  *Id.*  Thus, *Collins* dealt with

allegations of fact and legal issues that are distinct from, and
not analogous to, those presented here.

In light of the foregoing, the court concludes that
there remain genuinely disputed material facts as to TEA
Courtney's actions and personal involvement in plaintiff's
arrest.

### 2. *Probable Cause and Privilege to Confine*

Defendants contend that plaintiff's false arrest claim
must fail because there was probable cause for plaintiff's
arrest, thus, the arrest was privileged. (*See* Def. Mem. at 6-
11.) As set forth below, the court concludes that although
Officer Nicolas had probable cause to arrest plaintiff, on the
record before the court, TEA Courtney cannot avail herself of
Officer Nicolas's probable cause to defeat plaintiff's false
arrest claim against her.

According to defendants, probable cause to arrest
plaintiff existed because "a male, black construction worker"
informed Officer Nicolas that "he observed that 'an officer was
getting assaulted,'" and "[u]pon receiving that information,
Officer Nicolas reported to the incident location and identified
[p]laintiff as the perpetrator of the purported assault on [TEA]
Courtney's person." (Def. Mem. at 8 (citing Def. 56.1 at ¶¶ 11,
12, 16, 17-19).) Defendants' reply further clarifies their
position that the construction worker's purported report to

Officer Nicolas forms the basis for their assertion that probable cause existed to arrest plaintiff.  (*See* Def. Repl. at 2-5.)

Although plaintiff has not conceded the involvement of any construction worker, he has not properly controverted the construction worker's involvement.  Plaintiff's Local Rule 56.1 Counter-statement "denies that any construction worker intervened" in his initial interaction with TEA Courtney (Pl. 56.1 ¶ 12 (citing Pl. Tr. at 59:5-10, 60:7-61:3)), and "objects to the allegation that a construction worker was involved in this incident."  (*Id.* ¶ 15 (no citation).)  The only evidence plaintiff cites in support of these contentions, however, is wholly silent as to the presence of any construction worker, and thus does not deny that a construction worker was involved. (*See* Pl. Tr. at 59:5-10, 60:7-61:3.)  Consequently, and as relevant to defendants' probable cause defense, plaintiff has not properly controverted Officer Nicolas's testimony that a construction worker reported an assault to Officer Nicolas.

Nevertheless, although the fact and substance of the construction worker's report to Officer Nicolas are not genuinely disputed, the report alone was insufficient to provide probable cause to arrest plaintiff.  "Probable cause [to arrest] is established when the arresting officer has knowledge or reasonably trustworthy information sufficient to warrant a

person of reasonable caution in the belief that an offense has been committed *by the person to be arrested*." *Singer*, 63 F.3d at 119 (internal quotation marks and citations omitted) (emphasis added).

The parties' Local Rule 56.1 statements establish that there is no dispute that TEA Courtney identified plaintiff as her purported assailant by pointing at him. (Def. 56.1 ¶ 19; Pl. 56.1 ¶ 19.) Additionally, defendants' own moving papers assert that TEA Courtney, and not the construction worker, "identified [p]laintiff as the perpetrator of the purported assault" on TEA Courtney. (Def. Mem. at 8.) Further, at his deposition, Officer Nicolas testified that the construction worker told him only "that an officer [wa]s getting assaulted," and when Officer Nicolas asked where the assault was taking place, "[the construction worker] said at the corner," at which point Officer Nicolas went to the incident location. (Nicolas Tr. at 58:19-59:3.)[11]

Thus, although the construction worker's report sufficed to "warrant a person of reasonable caution in the belief that an offense ha[d] been committed," *Singer*, 63 F.3d at 119, nothing in the report itself indicated that plaintiff, who was the person to be arrested, had committed the offense.

---

[11]   As stated above at note 5, Officer Nicolas's testimony regarding the construction worker's report is admissible for its effect on the listener, but not as evidence that an assault actually took place.

Instead, Officer Nicolas received no information indicating that plaintiff had perpetrated an assault or any other offense until TEA Courtney told Officer Nicolas that an individual had pushed her and she pointed in plaintiff's direction.  (DSMF ¶ 19; PSMF ¶ 19; Nicolas Tr. at 59:4-63:1; *see also* Courtney Tr. at 48:17-50:8 (discussing TEA Courtney's initial conversation with Officer Nicolas and including testimony by TEA Courtney that immediately after she gave her account of events to Officer Nicolas, he "went to get" plaintiff); Def. Mem. at 8 (asserting that TEA Courtney, not the construction worker, identified plaintiff).)  Consequently, Officer Nicolas had probable cause to arrest plaintiff, but TEA Courtney's account of events, in conjunction with the construction worker's report, created this probable cause.

Plaintiff's false arrest claim, however, is against TEA Courtney, not Officer Nicolas, and as discussed above, plaintiff's testimony, if credited, suffices to enable a reasonable jury to conclude that TEA Courtney fabricated the account of events she conveyed to Officer Nicolas.  Further, the weight of persuasive authority indicates that a complainant who knowingly provides a false account of purported criminal conduct may not shelter in the arresting officer's resulting probable cause defense to defeat a false arrest claim.  In particular, the decisions of the New York Supreme Court, Appellate Division

33

in *Mesiti v. Wegman*, 763 N.Y.S. 2d 67 (N.Y. App. Div. 2003), and

of the United States District Court for the Eastern District of

New York in *Weintraub v. Board of Education*, 423 F. Supp. 2d 38

(E.D.N.Y. 2006), are instructive.

In *Mesiti*, the Appellate Division affirmed a jury

verdict in favor of an arrestee against a civilian complainant

alleging false arrest and malicious prosecution. 763 N.Y.S. 2d

at 68. The Appellate Division wrote that the plaintiff had been

"required to show that his arrest was not supported by probable

cause," and had met this burden by introducing evidence

regarding his conduct in the incident giving rise to his arrest.

*Id.* at 69-70. Notably, the complainant in that action had made

a report to the police regarding plaintiff, and the police had

actually effected the arrest, but this fact did not defeat the

plaintiff's false arrest claim against the complainant. *See id.*

at 68-69.

Along similar lines, in *Weintraub*, a plaintiff

brought, in relevant part, false arrest claims against both

civilian and law enforcement defendants. *See* 423 F. Supp. 2d at

41-42, 53-58. The court concluded that there was no genuine

dispute that the law enforcement defendant was "present when a

putative victim recounted her personal recollection of the

crime," and, therefore, the law enforcement defendant was

"privileged with probable cause" in arresting the plaintiff.

*Id.* at 55.  With respect to the civilian defendants, however, the court observed that "the classification of their role as civilian requires a preceding conclusion that they acted in good faith" in "ma[king] *ex parte* statements to police that caused plaintiff's arrest."  *Id.* at 58.  Because there were "genuinely disputed facts over whether defendants intended by their actions to have plaintiff falsely arrested," the court denied summary judgment to the civilian false arrest defendants.  *Id.*

Thus, even accepting defendants' contention that "TEA Courtney's actions, as alleged, are indistinguishable from those of any civilian-victim of a crime" (Def. Mem. at 15), TEA Courtney may nevertheless be liable to plaintiff for false arrest.[12]  As discussed above, based on the record before the court, a jury could conclude that TEA Courtney provided false information to the NYPD with the intent to have plaintiff arrested, and "[i]f a victim makes false statements to the police, with the intent to have an innocent person arrested in violation of his Fourth Amendment rights, she may not only be held accountable for false imprisonment under state tort law, but under federal law, for invoking the state's power to intentionally violate a citizen's constitutional rights."

---

[12]    As discussed below in section "Discussion – II.B.4," TEA Courtney did not act solely as a "civilian-victim," as she was at all relevant times a state actor.  Her status as a state actor, however, does not alter the conclusion that a complainant who fabricates a police report with the intent to have another person falsely arrested may be liable for false arrest.

*Weintraub*, 423 F. Supp. 2d at 58.  Consequently, the court respectfully rejects defendants' argument that Officer Nicolas's probable cause to arrest plaintiff is a sufficient basis to grant summary judgment against plaintiff on his false arrest claim against TEA Courtney.

### 3.  *Deprivation of Constitutional Rights*

Plaintiff's account of his conduct on March 13, 2015, which a reasonable jury could credit, would also establish that TEA Courtney's actions deprived him of his constitutional rights "not to be arrested without probable cause," *Cook v. Sheldon*, 41 F.3d 73, 78 (2d Cir. 1994) (citations omitted), and "not to be deprived of liberty on the basis of false evidence fabricated by a government officer."  *Zahrey v. Coffey*, 221 F.3d 342, 355 (2d Cir. 2000) (citations omitted).

Each of the offenses for which defendants assert there was probable cause to arrest plaintiff requires either physical contact, an attempt to make physical contact, placement of a victim in apprehension of imminent physical injury by menace, intimidation, or physical interference with governmental activities.  (*See* Def. Mem. at 8-9 (discussing relevant offenses).)  As discussed above, however, plaintiff testified that he verbally questioned the propriety of the parking ticket that TEA Courtney issued him.  Although plaintiff admits he raised his voice, he denies that he physically interfered with

TEA Courtney's performance of her job duties, made or attempted to make physical contact with her in any way, placed or attempted to place her in fear of physical harm, or intimidated her.

Instead, plaintiff's testimony, if credited by a jury, would establish that TEA Courtney fabricated an account of a physical assault by plaintiff. From this, as discussed above, a reasonable jury could conclude that TEA Courtney sought to effect an arrest of plaintiff without probable cause and/or fabricated evidence to deprive plaintiff of his liberty. Consequently, there is sufficient evidence from which a jury could find that TEA Courtney's actions deprived plaintiff of "rights, privileges, or immunities secured by the Constitution or laws of the United States." *Pitchell*, 13 F.3d at 547 (citations omitted).

### 4.    *"Under Color of Law"*

Defendants contend that plaintiff cannot establish that TEA Courtney acted "under color of law" within the meaning of section 1983 in reporting plaintiff's alleged assault of her to police because in making her report(s), TEA Courtney "did not exercise . . . any powers uniquely bestowed upon her as a byproduct of her position by the City of New York." (Def. Mem. at 15.) As mentioned above, defendants further assert that TEA Courtney's "actions, as alleged, are indistinguishable from

those of any civilian-victim of a crime and did not arise from her official duties." (*Id.*) This argument is meritless.

As an initial matter, defendants' contention that TEA Courtney's actions "did not arise from her official duties" is inconsistent with the record and illogical. Even under defendants' view of the facts, on March 13, 2015, TEA Courtney was performing her official duties, plaintiff became angry with her because of the manner in which she performed her official duties and pushed her, and TEA Courtney reported the push to police officers. Additionally, defendants assert that probable cause existed to arrest plaintiff for Obstruction of Governmental Administration in the Second Degree. (Def. Mem. at 9.) Liability for this offense can only lie where, in relevant part, a person "intentionally obstructs, impairs or perverts the administration of law or other governmental function or prevents or attempts to prevent a public servant from performing an official function." N.Y. Penal Law § 195.05.

Defendants do not explain how it can simultaneously be the case that defendant obstructed TEA Courtney's performance of official duties, but that TEA Courtney's action in reporting that purported obstruction "did not arise from her official duties." In any event, under any reasonable interpretation of the phrase "arise from," TEA Courtney's report arose from her official duties.

Moreover, the test for whether conduct is taken "under color of law" is not whether a person exercises powers "uniquely bestowed upon [that person] as a byproduct of [that person's] position" in a government agency. Instead, the test is whether "the defendant's alleged infringement of the plaintiff's federal rights is 'fairly attributable to the State.'" *West v. Atkins*, 487 U.S. 42, 49 (1988) (quoting *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982)). For this reason, liability under section 1983 can extend even to private actors, so long as "the claimed deprivation has resulted from the exercise of a right or privilege having its source in state authority," and the party responsible for the deprivation "may be appropriately characterized as [a] 'state actor[].'" *Lugar*, 457 U.S. at 939.

Importantly, "[s]tate employment is generally sufficient to render the defendant a state actor," *West*, 487 U.S. at 49 (quoting *Lugar*, 457 U.S. at 936 n.18), and it is "firmly established that a defendant in a [section] 1983 suit acts under color of state law when he [or she] abuses the position given to him [or her] by the State." *Id.* at 49-50 (citation omitted). Defendants cite a number of cases for the uncontroversial proposition that government employees are not always and in all circumstances state actors. A conclusion that a government employee did not act "under color of law" in undertaking complained-of conduct, however, requires a basis to

39

conclude that the employee's actions were not fairly attributable to the state.

For instance, defendants cite the Supreme Court's decision in *Polk County v. Dodson* (Def. Mem. at 14), but there, the employee in question was a public defender. *See* 454 U.S. 312, 320-21 (1981). The Supreme Court observed that public defenders are "not amenable to administrative direction in the same sense as other employees of the State," and that each State is "constitutional[ly] obligat[ed] . . . to respect the professional independence of the public defenders whom it engages." *Id.* at 321-22. Defendants do not explain why TEA Courtney is comparable to a public defender in these, or any other, respects.

Similarly, defendants cite *Nadig v. Nadel* (Def. Mem. at 15), an out-of-circuit district court decision in which the court concluded that the plaintiffs had not sufficiently alleged that the defendant was a state actor. 272 F. Supp. 2d 509, 512 (E.D. Pa. 2003) In *Nadig*, the plaintiffs cited only a victim impact statement in a separate proceeding by the defendant that referenced the defendant's government employment but "was not written in connection with [that] position," and on its face suggested that the defendant's employment had no impact on his interaction with plaintiffs. *Id.* Defendants do not explain why

*Nadig*'s facts are comparable to those suggested by plaintiff's evidence.

Instead, the only concrete basis defendants offer for their implicit assertion that TEA Courtney's state employment does not suffice to render her a state actor is that TEA Courtney's "actions are indistinguishable from those of any civilian-victim of a crime and did not arise out of her official duties." (Def. Mem. at 15; Def. Repl. at 10.)  As discussed above, however, TEA Courtney's actions, whether on plaintiff's or defendant's view of the facts, very clearly arose out of her official duties.  Additionally, plaintiff's testimony, if credited, would establish that TEA Courtney sought to use her government-issued work equipment in furtherance of an effort to have plaintiff falsely arrested when he verbally protested the manner in which she performed her official functions.  This would represent a clear abuse of the position given to TEA Courtney by the state, and accordingly would suffice to establish that TEA Courtney acted under color of law.

Further, even a private citizen can be liable for false arrest under section 1983 where the private citizen "'intentionally provided false information' to instigate an arrest by law-enforcement officials, or had no reasonable basis for the report." *Biswas*, 973 F. Supp. 2d at 519 (citations omitted); *accord Weintraub*, 423 F. Supp. 2d at 58.  In such

circumstances, the private actor "invoke[es] the state's power to intentionally violate a citizen's constitutional rights," *Weintraub*, 423 F. Supp. 2d at 58, and thus "may be appropriately characterized as [a] 'state actor[].'" *Lugar*, 457 U.S. at 939; *see also Dennis v. Sparks*, 449 U.S. 24, 27-28 (1980) ("[T]o act 'under color of' state law for [section] 1983 purposes does not require that the defendant be an officer of the State. It is enough that he is a willful participant in joint action with the State or its agents. Private persons, jointly engaged with state officials in the challenged action, are acting . . . 'under color' of law for purposes of [section] 1983 actions." (citations omitted)); *Friedman v. New York City Admin. for Children's Servs.*, No. 04-CV-3077(ERK), 2005 WL 2436219, at *8 (E.D.N.Y. Sept. 30, 2005) (concluding allegations that defendant provided false oral and written reports to the government to deny plaintiff's constitutional rights sufficed to plead that defendant acted under color of law on joint participation theory).

Accordingly, the court concludes that a reasonable jury could find that TEA Courtney acted under color of law within the meaning of section 1983 under circumstances relevant to plaintiff's March 13, 2015 arrest.

### C.   Qualified Immunity

Finally, defendants assert that TEA Courtney is entitled to qualified immunity (Def. Mem. at 11; Def. Repl. at 5), but this contention is meritless.

"Qualified immunity protects public officials from liability for civil damages when one of two conditions is satisfied: (a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law." *Garcia v. Does*, 779 F.3d 84, 92 (2d Cir. 2015) (quoting *Russo*, 479 F.3d at 211).  In deciding whether a right is clearly established, "[o]nly Supreme Court and Second Circuit precedent existing at the time of the alleged violation is relevant." *Moore v. Vega*, 371 F.3d 110, 114 (2d Cir. 2004) (citing *Townes v. City of New York*, 176 F.3d 138, 144 (2d Cir. 1999)). Additionally, in determining objective reasonableness, "the relevant question is whether a reasonable offic[ial] could have believed the [challenged conduct] to be lawful, in light of clearly established law and the information the . . . offic[ial] possessed."  *Id.* at 115 (quoting *Anderson v. Creighton*, 483 U.S. 635, 641 (1987)).

Here, the rights not to be arrested without probable cause and not to be deprived of liberty on the basis of a State officer's fabrication of false evidence were clearly established

well before March 13, 2015.  *See Cook*, 41 F.3d at 78 ("It is now far too late in our constitutional history to deny that a person has a clearly established right not to be arrested without probable cause." (citing *Soares v. State of Connecticut*, 8 F.3d 917, 920 (2d Cir. 1993) and *Golino v. City of New Haven*, 950 F.2d 864, 870 (2d Cir. 1991))); *Zahrey*, 221 F.3d at 355 ("It is firmly established that a constitutional right exists not to be deprived of liberty on the basis of false evidence fabricated by a government officer." (citing *Scotto v. Almenas*, 143 F.3d 105, 113 (2d Cir. 1998), *Ricciuti*, 124 F.3d at 130, and *White v. Frank*, 855 F.2d 956, 961 (2d Cir. 1988))).

Further, although the Supreme Court has "repeatedly stressed that courts must not define clearly established law at a high level of generality," it has also clarified that "a rule is too general if the unlawfulness of the [official]'s conduct does not follow immediately from the conclusion that the rule was firmly established."  *District of Columbia v. Wesby*, 138 S. Ct. 577, 590 (2018) (internal quotation marks and citations omitted).  Plaintiff's testimony, if credited by a jury, would support a conclusion that TEA Courtney fabricated an account of an assault by plaintiff with the intent to effect plaintiff's arrest, and succeeded in effecting that arrest.  That this alleged conduct is unlawful "follows immediately from the conclusion" that the rights not to be arrested without probable

44

cause and not to be deprived of liberty based on fabricated evidence are clearly established. Additionally, no reasonable officer could believe that fabricating an account of an assault in order to have a person falsely arrested would not violate clearly established law.

Finally, defendants' qualified immunity argument rests, in part, on their contention that there was, at a minimum, arguable probable cause to arrest plaintiff. (Def. Mem. at 11; Def. Repl. at 5.) There are, however, genuine issues of fact as to whether or not TEA Courtney's account of plaintiff's actions, which led to plaintiff's arrest and prosecution, was fabricated. Thus, the court cannot conclude at the summary judgment stage that TEA Courtney is entitled to qualified immunity.

For the foregoing reasons, summary judgment on plaintiff's false arrest claim is denied. Moreover, the court cannot determine at the summary judgment stage that TEA Courtney is entitled to qualified immunity.

## CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is GRANTED in part and DENIED in part as follows:

(1) Defendants' motion is DENIED with respect to

plaintiff's causes of action for false arrest and

false imprisonment under section 1983 against TEA
Courtney, which the court construes as a single cause
of action for false arrest under section 1983; and

(2) Defendants' motion is GRANTED in all other respects.
Specifically, defendants are GRANTED summary judgment
dismissing plaintiff's First Cause of Action for
"Deprivation of Federal Civil Rights Under 42 U.S.C. §
1983," Fourth Cause of Action for Malicious
Prosecution Under State Law, and Fifth Cause of Action
for Negligence.

Plaintiff's only remaining claim in this action is his
section 1983 false arrest claim against TEA Courtney.  The
parties are respectfully directed to submit a joint letter no
later than October 11, 2018, advising the court as to how they
intend to proceed.

**SO ORDERED.**

Dated: Brooklyn, New York
       September 27, 2018

                                    /s/
                          _____
                          KIYO A. MATSUMOTO
                          United States District Judge
                          Eastern District of New York